UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

JANET FASHAKIN,

                    Plaintiff,

          - against -

                                              **MEMORANDUM & ORDER**
                                              05-CV-3080 (RRM)

NEXTEL COMMUNICATIONS, TIMOTHY M.
DONAHUE, RISK MANAGEMENT
ALTERNATIVES, INC., TRANS UNION, LLC,
ALLIED INTERSTATE, INC.,

                    Defendants.

------------------------------------------------------------X

MAUSKOPF, United States District Judge.

Plaintiff Janet Fashakin brings this action against Nextel Communications ("Nextel"),

Nextel Chief Executive Officer Timothy M. Donahue, Risk Management Alternatives, Inc.

("RMA"), Allied Interstate, Inc. ("Allied"), and Trans Union, LLC ("Trans Union"), alleging

violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§1681–1681x, the Fair Debt

Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p, and New York state law, in

connection with the collection of an alleged debt owed by plaintiff to Nextel. Remaining

defendants[1] Allied and Trans Union now move for summary judgment. For the reasons stated

below, both Allied's motion and Trans Union's motion are GRANTED in their entirety.

---

[1] Plaintiff's claims against defendant Donahue were dismissed for failure to state a claim by Order of Judge Townes on July 5, 2006 (Docket No. 16). Defendant Nextel was dismissed pursuant to a settlement agreement with plaintiff on January 11, 2007 (Docket No. 26). Defendant RMA has never been served or appeared in this case and has, according to plaintiff, declared bankruptcy. (See Tr. of Mar. 4, 2008 Conf., at 5; see also Pl.'s Response to Defs.' Rule 56.1 Statement (Docket No. 45), ¶ 3 & Ex. 2.) Nevertheless, RMA was never dismissed or otherwise terminated from this action. Should plaintiff intend to continue this action against RMA, this Court hereby allows plaintiff fourteen (14) days from the date of this decision (1) to file proof of service of her Complaint and this decision on RMA with the Court, or to submit an affidavit demonstrating good cause for the failure to effect such service, and (2) to file an affidavit stating her intent to prosecute this action against RMA. Failure to file proof of service or to show good cause for failure to serve shall result in dismissal of plaintiff's claims against RMA pursuant to Fed. R. Civ. P. 4(m).

## BACKGROUND

The Court presumes the parties' familiarity with the procedural history and factual background of this dispute. The following facts, however, are relevant to the instant motion.[2]

From 2001 to 2004, plaintiff was a Nextel cellular telephone customer. In 2004, she terminated her contract with Nextel, dissatisfied with the quality and cost of service. Unpaid charges in the amount of $339.00 remained on her account, a debt which plaintiff disputes. In July 2004, after plaintiff did not pay this alleged debt, Nextel referred it to RMA, a debt collector. RMA then began to call plaintiff at her office in attempts to collect on the alleged debt.[3]

In or around November and/or December 2004, after two credit card companies turned down plaintiff's applications and a third closed an existing card with her, plaintiff ordered a credit report. (See Nov. 30, 2004 Letter from Bank of America to Janet O. Fashakin (attached as Ex. D to Def. Trans Union LLC's L.R. 56.1 Statement (Docket No. 44) (Trans Union's L.R. 56.1 Statement), at 3); Dec. 20, 2004 Letter from Discover to Janet O. Fashakin (attached as Ex. D to Trans Union's L.R. 56.1 Statement), at 2.) From this report and from information provided by one of the credit card companies that had rejected her, plaintiff learned that RMA had filed a derogatory report regarding her alleged debt and that Trans Union, a consumer reporting agency,

---

[2] As shall be evident, plaintiff's submissions are not models of clarity; a number of her factual allegations (especially regarding the dates of certain events) are particularly unclear and some appear inconsistent. Given the procedural posture of this case, this Court has interpreted plaintiff's allegations in the light most favorable to her.

[3] Nextel had given plaintiff's office number to RMA.

had provided credit information regarding the debt. After exchanges with these two companies, plaintiff sent a letter, received by Trans Union on December 23, 2004, stating that she "categorically dispute[d]" owing $339.00 to Nextel (the "Dispute Letter") (attached as Ex. 1 to Decl. of Laura M. Henry (Docket No. 44)).

In response to the Dispute Letter, Trans Union sent RMA an Automated Consumer Dispute Verification ("ACDV"), requesting that RMA confirm the ownership of plaintiff's debt. RMA verified plaintiff's outstanding debt account and confirmed her name, current address and Social Security number. RMA also confirmed that the account information was accurate as of the date of the ACDV. Trans Union sent plaintiff a letter, dated December 27, 2004, describing its reinvestigation procedure. On January 12, 2005, Trans Union followed up with a letter to her reporting the results of the reinvestigation. This letter, which plaintiff received on January 16, 2005, said that RMA confirmed the report, and provided plaintiff with RMA's name and telephone number. Notably, Trans Union did not contact Nextel to inquire about the debt. Plaintiff alleges that if Trans Union had done so, they would have discovered that she owed no debt to Nextel. After receiving this letter, plaintiff contacted RMA, who informed her that it no longer had her file, which had been returned to Nextel. Plaintiff was told to contact Nextel directly.

Plaintiff alleges that on or around January 2, 2005, she again began receiving phone calls from unidentified individuals regarding the alleged debt, and plaintiff identifies Allied as the

3

source of these calls.[4] Allied disputes this allegation, arguing that Nextel only retained Allied as a secondary debt collector on January 11, 2005, that Allied only opened a file for plaintiff's debt on January 12, and that Allied first called her on January 15. In support, Allied produced a phone log purporting to include every call they made to plaintiff. (See Phone Log (attached as Ex. F to Decl. of Jeffrey S. Ettenger, dated Apr. 4, 2008 (Docket No. 41) ("Ettenger Decl.").) According to the log, Allied called plaintiff's office six times—no more than once per day— between January 15 and January 22, 2005.

Plaintiff alleges that several of the calls were to her office, including to office receptionists. According to plaintiff, the callers did not identify themselves to the receptionists but did tell the receptionists that plaintiff owed a debt to Nextel and that if she did not pay this debt, she would "be reported to the credit bureau" and "her credit would be damaged." Allied does not deny that its employees did not identify themselves to the receptionists but disputes plaintiff's other allegations regarding the content of their communications with her receptionists. Plaintiff further alleges that Allied called her at odd hours. Allied denies that the calls were made either before 8:00 a.m. or after 9:00 p.m., the FDCPA's permitted call period. Allied indicates that their automated phone system does not allow calls to be made at times other than the statutorily prescribed period. In support, Allied again relies on the phone log, showing that

---

[4] Plaintiff's allegations on this point are inconsistent. Her Complaint states that these calls started "on or about January 2005," (Compl. ¶ 27), her May 5, 2008 affidavit states that an Allied agent spoke with her office receptionists "between December 2004 and January 2005," (Fashakin Aff. ¶ 7 (Docket No. 43)), and her Opposition states both that these calls "started weeks before January 2005," and that she "remembers a communication of about January 2, 200[5]," (Pl.s' Mem. L. Opp'n Def. Allied's Mot. Summ. J. (Docket No. 43) at 9, 19).

calls were not made outside of the 8:00 a.m. to 9:00 p.m. window. Although plaintiff alleges that she "told callers at various times that . . . they should stop calling," she does not allege that she told Allied to refrain from contacting her at her office.

On or about January 15, 2005, "[t]ired of the harassment and emotional and mental aggravations," plaintiff allegedly informed an Allied representative that she was willing to pay the debt but would "never agree to give her credit card information to a faceless person who would not identify himself." According to plaintiff, the caller promised to remove any derogatory credit report against her, an allegation which Allied disputes.

On or around January 17, 2005, plaintiff called Allied and told them that a poor credit report has already been issued because of the alleged debt. On or around January 18,[5] plaintiff received a letter entitled "Special Notice and Payment Demand" from Allied, providing certain details about the debt.

On January 22, 2005, allegedly "unable to sleep due to emotional, mental and physical distress," plaintiff paid Allied $237.83, the "total sum [now] specified as settlement amount." Allied did not, as allegedly promised, remove the derogatory credit report after payment of the

---

[5] Although the actual mailing date of this letter is unclear, Allied indicated has indicated a willingness to stipulate that the letter was mailed on January 18, 2005. (Tr. of Dep. Of Sharon Livermont, July 12, 2007, at 23 (attached as Ex. E to Ettenger Decl.)).

debt, and plaintiff alleges that her poor credit rating continued to affect her ability to secure loans and credit cards.[6]

Plaintiff filed the instant complaint *pro se* against Nextel, Donahue, RMA, Allied, and Trans Union on June 27, 2005. Active claims now remain only as to Allied and Trans Union. Plaintiff alleges that Allied violated the FDCPA when it: called her at odd hours; called her office without her permission; spoke to third parties regarding her debt; called her repeatedly; refused to disclose its identity or phone numbers; told her that if she did not pay her debt, it would report her to a consumer reporting agency; and failed to provide timely written notice of her debt. Plaintiff also advances claims against Trans Union, alleging that it violated the FCRA by failing to properly reinvestigate her claim, and that it defamed her by refusing either to remove the information from her credit report or to show on the report that the information was disputed. Plaintiff's Complaint also alleges unspecified violations of New York state law.[7] Allied and Trans Union now move for summary judgment.

## DISCUSSION

### I.  Standard of review

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there "is no genuine issue as to any material fact and

---

[6] As noted previously, plaintiff and Nextel resolved the dispute over her bill in late 2006 or early 2007, and the derogatory statement was removed from her credit report.

[7] The Court cannot determine from her Complaint what these alleged violations are, nor whether they are advanced against Allied, Trans Union or both.

that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The burden of establishing that no genuine factual dispute exists rests on the party seeking summary judgment. Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 322.

Once a moving party meets this initial burden, the nonmovant "must come forth with evidence sufficient to allow a reasonable jury to find in their favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Conclusory allegations, conjecture, and speculation are insufficient to do so. Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998). In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. Anderson, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)); see also Brosseau v. Haugen, 543 U.S. 194, 195 n.1 (2004).

To defeat summary judgment once the moving party has carried its burden under Rule 56(c), "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or

unsubstantiated speculation," <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998) (collecting

cases). "[A]ll that is required [from a nonmoving party] is that sufficient evidence supporting the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial." <u>McClellan v. Smith</u>, 439 F.3d 137, 144 (2d Cir. 2006) (quoting

<u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288–89 (1968)). However, where

"the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the

nonmovant fails to make a showing sufficient to establish the existence of an element essential to

[its] case." <u>Nebraska v. Wyoming</u>, 507 U.S. 584, 590 (1993) (quoting <u>Celotex</u>, 477 U.S. at 322)

(internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for

summary judgment must prevail if the plaintiff fails to come forward with enough evidence to

create a genuine factual issue to be tried with respect to an element essential to its case." <u>Allen</u>

<u>v. Cuomo</u>, 100 F.3d 253, 258 (2d Cir. 1996) (citing <u>Anderson</u>, 477 U.S. at 247–48).

While it is well settled that the pleadings of *pro se* litigants should be construed liberally

to compensate for their lack of legal training, see, e.g., <u>Green v. United States</u>, 260 F.3d 78, 83

(2d Cir. 2001), such liberal treatment is not justified here. Plaintiff is an attorney—she attended

law school, received an L.L.M., and had been a member of the New York bar for roughly seven

years when she filed her summary judgment papers—and therefore does not merit traditional *pro*

*se* deference. <u>See, e.g.</u>, <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 82 n.4 (2d Cir. 2001) (*pro se*

attorneys typically "cannot claim the special consideration which the courts customarily grant to

*pro se* parties") (quoting Harbulak v. County of Suffolk, 654 F.2d 194, 198 (2d Cir. 1981)); see also Padilla v. Payco Gen. Am. Credits, Inc., 161 F. Supp. 2d 264, 271 (S.D.N.Y. 2001).

## II.    The Fair Debt Collection Practices Act

The FDCPA, which was enacted to eliminate the use of "abusive, deceptive and unfair debt collection practices by . . . debt collectors," 15 U.S.C. § 1692(a), (e), sets out guidelines for debt collection. Plaintiff's complaint specifically alleges violations of 15 U.S.C. § 1692c and § 1692g, and invokes the language of § 1692d.[8] Plaintiff has failed to establish a genuine issue of material fact as to any of these claims and defendants are entitled to judgment as a matter of law.

*A.    Impermissible communications with plaintiff – 15 U.S.C. § 1692c(a)*

Section 1692c(a) regulates debt collectors' communications the debtors. Specifically, it directs debt collectors who lack the consumer's express permission not to contact consumers "at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer," and only to contact them between 8 a.m. and 9 p.m. 15 U.S.C. § 1692c(a)(1). Debt collectors also may not contact a debtor at their place of employment "if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication." 15 U.S.C. § 1692c(a)(3). Plaintiff alleges violations of both provisions; she claims that Allied contacted her outside of the statutorily prescribed time period,

---

[8] Plaintiff alleges that Allied engaged in "conduct the natural consequence of which is to harass, oppress, or abuse . . ." in connection with the "collection of [an] alleged debt." (Compare Complaint ¶ 47, with 15 U.S.C. § 1692d.)

in violation of § 1692c(a)(1), and that that Allied violated § 1692c(a)(3) by contacting her at her workplace without her permission.

In response to plaintiff's first allegation, Allied produced a call log purportedly showing all communications between Allied and plaintiff. The call log indicates that no calls were made to plaintiff at improper times. Plaintiff provides no contrary evidence, such as her own phone records demonstrating that she received calls before 8 a.m. and/or after 9 p.m.[9] Although plaintiff provides an affidavit, in it she states only that Allied called her "morning and night." Because the affidavit does not set forth facts that are either specific or supported, it is insufficient to defeat a motion for summary judgment. See, e.g., Bickerstaff v. Vassar Oil, 196 F.3d 435, 452 (2d Cir. 1998) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."). Because there is no genuine dispute on this issue, this claim is dismissed.

Plaintiff further claims that Allied violated § 1692c(a)(3) by contacting her at her workplace without permission. She misreads the statute. The FDCPA does not require debt collectors to secure a debtor's permission before calling their place of employment, but instead

---

[9] Plaintiff argues that the court should find that this issue remains in dispute because Allied erased the recorded tapes of their calls with her, apparently accusing Allied of destroying these tapes as part of a "cover up." (See Pl.'s Mem. L. Opp'n Def. Allied's Mot. Summ. J. at 17.) Plaintiff had ample opportunity to raise these concerns but failed to do so during or after discovery, before either the Magistrate Judge or before this Court, and she makes no attempt to explain her delay. Her attempt to raise the issue now, on summary judgment, is unacceptably untimely. See, e.g., Tri-County Motors, Inc. v. Am. Suzuki Motor Corp., 494 F. Supp. 2d 161, 178 (E.D.N.Y. 2007), aff'd, 2008 U.S. App. LEXIS 24109 (2d Cir. 2008). Furthermore, plaintiff does not argue that the call log is inaccurate, and so her claims of a "cover up," even if credited, would not create a genuine issue of material fact as to her allegations of allegedly untimely calls. Finally, Allied provided testimony that calls are recorded solely for training purposes, and are routinely erased after seven days. (See Allied's Reply Mem. (Docket No. 43) at 8 (citing Livermont Dep. Tr. at 31).)

prohibits such communications only if the debt collector "knows or has reason to know" that the consumer's employer prohibits such communication. 15 U.S.C. §1692c(a)(3). See Horkey v. J.V.D.B. & Assocs., 333 F.3d 769, 773 (7th Cir. 2003) ("[T]he dispositive question is whether [the debt collector] knew or had reason to know that [the debtor's] employer prohibited such communication."). Plaintiff has not made any showing (or indeed, any allegation) that her employer prohibited such communications in the first place. In fact, the available evidence suggests that plaintiff is self-employed. Furthermore, the idea that such a policy might have existed is also undercut by evidence that plaintiff herself appears to have contacted Allied from her workplace. Even had such a policy prohibiting this type of communications existed, however, plaintiff has also failed to make any allegations that Allied knew or should have known of such a policy. Summary judgment must therefore be granted in favor of Allied on this claim as well.

### B. Communications with third parties – 15 U.S.C. § 1692c(b)

Section 1692c also prohibits debt collectors from communicating with third parties regarding a debtor's debt without consumer consent. 15 U.S.C. § 1692c(b) (without the consent of the consumer, "a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector"); Forman v. Acad. Collection Serv., Inc., 388 F. Supp. 2d 199, 203 (S.D.N.Y. 2005). Third-party communications are permitted for the limited purpose of determining a debtor's

11

location but the content of these communications is strictly defined, and the debt collector cannot disclose that the debtor owes any debt. 15 U.S.C. § 1692b(2). The statute defines "communication" as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2).

Plaintiff alleges that Allied violated this provision by telling office receptionists that plaintiff owed a debt to Nextel and that she would be reported to the National Credit Bureau, with resultant damage to her credit, if she did not pay this debt. Such allegations, if true, would violate the FDCPA. Committe v. Dennis Reimer Co., L.P.A., 150 F.R.D. 495, 499 (D. Vt. 1993) ("[T]he debt collector is not permitted to disclose [to a third party] that the debtor owes any debt."). Allied produces a call log confirming contact with a third party at plaintiff's office on at least one occasion but asserts, with a deposition in support, that any third-party discussions stayed within statutorily-prescribed bounds. In response, plaintiff provides her own affidavit, stating that Allied told receptionists at plaintiff's workplace that "plaintiff owed Nextel," and that unless she paid her debt "she would be reported to the Credit Bureau and her credit would be damaged."

To avoid summary judgment, a non-moving party must "identify sufficient admissible evidence . . . so as to demonstrate that there existed a genuine issue of material fact . . . ," Trebor Sportswear Co., Inc. v. Limited Stores, Inc., 865 F.2d 506, 509 (2d Cir. 1989), and thus "cannot rely on inadmissible hearsay in opposing a motion for summary judgment," Burlington Coat Factory Warehouse Corp. v. Esprit de Corp., 769 F.2d 919, 924 (2d Cir. 1985). The Federal

12

Rules of Evidence define hearsay as "a statement . . . offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Here, plaintiff's only evidence that impermissible statements were made to third parties is her own affidavit relating statements allegedly made to her receptionists. This is hearsay, as plaintiff attempts to rely, presumably, on statements made to her by her receptionists for the truth of the matters asserted therein, namely, that such alleged conversations with Allied representatives in fact occurred as described. Plaintiff claims no personal knowledge as to the content of any such conversation, nor does she offer any affidavits from her receptionists. Because plaintiff offers only inadmissible hearsay in support of her allegations of violation of 15 U.S.C. § 1692(b), these claims must also be dismissed.[10]

---

[10] Rule 56(e) requires that affidavits offered in opposition to a motion for summary judgment be made "on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e). While the Supreme Court has recognized that a nonmoving party need not produce evidence in opposition to summary judgment in a "form" admissible at trial, Celotex, 477 U.S. at 324, the nonmoving party nonetheless must give the Court some assurance that such evidence will be in admissible form by the time of trial. See, e.g., McMillan v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996) (noting that Celotex "simply allow[ed] otherwise admissible evidence to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form), aff'd, 520 U.S. 781 (1997); see also Beyah v. Coughlin, 789 F.2d 986, 989 (2d Cir. 1986) (The Rule 56(e) requirement means that "'hearsay testimony . . . that would not be admissible if testified to at the trial may not properly be set forth in [the Rule 56(e)] affidavit.'") (quoting 6 Moore's Federal Practice ¶ 56.22[1], at 56-1312 to 56-1316 (2d ed. 1985)); 11 Moore's Federal Practice § 56.14(d) ("To be acceptable at summary judgment stage, the evidence presented in the affidavit must be evidence that would be admissible if presented at trial through the testimony of the affiant as a sworn witness. For the content contained in the affidavit to be considered admissible evidence, it must not only be based on personal knowledge and contain evidence which would be admissible at trial, but the affiant must also be competent to testify to the matters set forth in the affidavit.").

*C. Conduct intended to annoy, abuse, or harass – 15 U.S.C. § 1692d*[11]

Section 1692d prohibits conduct "the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. The statute expressly includes among such prohibited acts, "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number," 15 U.S.C. § 1692d(5), and, except as otherwise provided, making calls "without meaningful disclosure of the caller's identity." 15 U.S.C. § 1692d(6). Plaintiff appears to allege that Allied employees violated this provision by (1) calling her repeatedly; (2) refusing to disclose their identities or phone numbers; and (3) telling her that if she did not pay her debt, Allied would report her to a consumer reporting agency. None of these claims survive summary judgment, and all are dismissed.

a)    <u>Harassment by frequent telephone calls</u>

Allied avers that it called plaintiff's office six times between receiving her account on January 15, 2005 and her payment of the disputed debt on January 22, 2005. Allied provides a call log consistent with this account. Plaintiff claims only that Allied's calls to her were "repeated." This allegation is neither adequately specific nor, more importantly, is it supported by any evidence that would enable it to withstand summary judgment. See <u>Bickerstaff</u>, 196 F.3d at 452; <u>Wahad v. F.B.I.</u>, 179 F.R.D. 429, 435 (S.D.N.Y. 1998) ("In accordance with [Rule

---

[11] As noted above, plaintiff does not cite § 1692d in her complaint; the Court instead surmises that she intended to do so from her invocation of the "harass, oppress, or abuse" language of that statutory provision.

56(e)], affidavits must contain specific facts based on first-hand knowledge."); <u>Goldston v.</u>

<u>Albany County Sheriff Dept.</u>, No. 02-CV-1004, 2006 WL 2595194, at *4 (N.D.N.Y. Sept. 11,

2006) ("[A]n affidavit . . . must not be conclusory . . . [it] is conclusory if, for example, its

assertions lack any supporting evidence or are too general." (citations omitted)). Plaintiff has not

produced phone records or even affidavits from the receptionists that she alleges received these

"repeated" calls. Bald allegations of this sort will not suffice to survive summary judgment.

Further, the number and frequency of Allied's verifiable phone calls to plaintiff,

approximately six in number including some that went unanswered and some where no message

was left, do not constitute "harassing" behavior as contemplated by 15 U.S.C. § 1692d. <u>See,</u>

<u>e.g.</u>, <u>Prewitt v. Wolpoff & Abramson, LLP</u>, No. 05-CV-725S(F), 2007 U.S. Dist. LEXIS 19148,

at *6-7 (W.D.N.Y. March 10, 2007) (denying summary judgment when defendant had called

plaintiff at least once per day, and sometimes multiple times per day, for a 200-day period);

<u>Udell v. Kan. Counselors, Inc.</u>, 313 F. Supp.2d 1135, 1144 (D. Kan. 2004) (granting summary

judgment for defendant when defendant had called plaintiff 4 times over 7 days); <u>cf.</u> <u>Chiverton v.</u>

<u>Fed. Fin. Group, Inc.</u>, 399 F. Supp.2d 96 (D. Conn. 2005) (denying summary judgment when

defendant repeatedly called plaintiff after plaintiff had hung up); <u>Akalwadi v. Risk Mgmt.</u>

<u>Alternatives, Inc.</u>, 336 F. Supp. 2d 492, 505–06 (D. Md. 2004) (denying summary judgment

when defendant made between twenty-six and twenty-eight phone calls to plaintiff's residence

during a two-month interval, including on one instance making three phone calls in a five hour

period).

15

### b) Failure to meaningfully disclose the caller's identity

Plaintiff also claims that Allied employees failed to provide meaningful disclosure of their identities under §1692d(6), which requires that "[a] debt collector may not engage . . . in connection with the collection of a debt [in] . . . the placement of telephone calls without meaningful disclosure of the caller's identity." 15 U.S.C. 1692d, (6). (See Compl. ¶ 28.) Courts have held that the meaningful disclosure required by § 1692d(6) has been made "'if an individual debt collector who is employed by a debt collection company accurately discloses the name of her employer and the nature of her business and conceals no more than her real name.'" Joseph v. J.J. Mac Intyre Cos., 238 F. Supp. 1158, 1167 (N.D. Ca. 2002) ("Joseph I") (quoting Wright v. Credit Bureau of Ga., Inc., 548 F. Supp. 591, 597 (N.D. Ga. 1982), reconsidered on other grounds, 555 F. Supp. 1005 (N.D. Ga. 1983).

Allied concedes that it did not leave messages or state the nature of its calls when communicating with plaintiff's receptionists. (Allied's Mem. L. Supp. Mot. Summ. J. (Docket No. 41) at 6.) Nevertheless, plaintiff's claim is unavailing. Defendants argue that in alleging a statutory violation resulting from Allied employees' failure to identify themselves when speaking to her office staff, plaintiff misapprehends what the law requires—if Allied's agents had provided meaningful disclosure of their identity to plaintiff's staff, Allied would have risked an impermissible third-party contact in violation of § 1692c(b). While the statutory language is somewhat ambiguous, this Court is sympathetic to defendants' argument that a debt collector confronted by a third-party gatekeeper, such as plaintiff's receptionists in this case, while

16

attempting to contact the debtor, cannot both provide meaningful disclosure pursuant to § 1692d(6) and comply with the requirements of § 1692c(b) preventing the disclosure of a consumer's personal affairs to third parties.[12]

In describing how to interpret statutory language, the Supreme Court has stated that there is "no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." United States v. Am. Trucking Ass'ns, Inc., 310 U.S. 534, 543 (1940) (citations omitted). When that language is sufficient to determine the purpose and application of the statute, courts should follow the plain meaning of the text. Id. "When that meaning has led to absurd or futile results, . . . [or even] when the plain meaning did

---

[12] The text of § 1692d(6) states broadly that the "placement" of calls without meaningful disclosure is prohibited, but does not define the scope of such placement. Courts addressing this provision have typically only addressed calls placed to the consumer. See, e.g., Edwards v. Niagara Credit Solutions, Inc., 586 F. Supp. 2d 1346, 1360 (N.D. Ga. 2008) ("Based on a plain reading of the statute, the Court concludes that, when a debt collector places a telephone call to a consumer without meaningful disclosure of the identity of the caller, it is not required that the telephone calls *also* be considered harassing, oppressing or abusive to the consumer in order to be in violation of 15 U.S.C. § 1692d(6)."); Baker v. Allstate Fin. Servs., Inc., 554 F. Supp. 2d 945, 949 (D. Minn. 2008) (discussing the placement of phone calls to a consumer where voicemails were left). Furthermore, while this Court has been unable to find any case law dealing with calls made by a debt collector to a receptionist or other third party in a direct attempt to speak with a consumer (and the parties have cited none), cases addressing the related situation of debt collectors leaving messages on voicemail or answering machines are instructive. In Joseph v. J.J. Mac Intyre Cos., 281 F. Supp. 2d 1156 (N.D. Ca. 2003) ("Joseph II"), plaintiff argued that defendant debt collector had violated § 1692d(6) by making automated phone calls leaving messages on her home answering machine that failed to provide meaningful disclosure of the caller's identity. Id. at 1163–64. Defendants argued that, due to the risk that a third party might hear the automated call or message, they were prohibited from making the disclosure required under § 1692d(6) by the conflicting requirements of §§ 1692b(1), 1692c(b), and 1692f(7)–(8) preventing them from disclosing that the consumer allegedly owed a debt. The Joseph II Court was unpersuaded by defendants' argument because it found that the possible compromise of privacy was unlikely when the calls at issue were made to the debtor's home phone number, and that therefore the privacy interests served by §§ 1692b(1), 1692c(b), and 1692f(7)–(8), dealing specifically with situations where third parties would be more likely to see or hear the message from the debt collector, were not implicated. Joseph II, 281 F. Supp. 2d at 1163–64; see also Hosseinzadeh v. M.R.S. Assocs., Inc., 387 F. Supp. 2d 1104, 1111–12 (C.D. Cal. 2005) (same). Here, there is not a mere risk of disclosure to third parties if Allied's agents had identified themselves to plaintiff's receptionists, but rather a certainty. Accordingly, this case is distinguishable from Joseph II and similar cases.

not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' [the Supreme] Court has followed that purpose, rather than the literal words." Id.; see also Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 60 (2004) ("Statutory construction is a 'holistic endeavor.'") (quoting United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988)). "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." Koons, 543 U.S. at 60 (quoting United Sav. Ass'n, 484 U.S. at 371) (citations omitted in original).

Here, the two provisions of the FDCPA at issue, § 1692c(b) and § 1692d(6), can be harmonized by (1) recognizing that the meaningful disclosure requirements of § 1692d(6) only apply when the telephone calls being placed are made directly to the consumer or some other party with whom the consumer has consented to allow the debt collector to communicate, and (2) that debt collectors, who, in attempting to reach a debtor, instead speak with a debtor's receptionist or some other third-party, may not make a meaningful disclosure of identity to this third-party without running afoul of the privacy-protective provisions of the FDCPA. This is consistent with the purpose of the FDCPA as evidenced by both the statutory structure and scheme and the legislative history, which reflects the drafters' desire to protect consumers from "unfair, harassing, and deceptive debt collection practices," including collection abuse by

18

"disclosing a consumer's personal affairs to friends, neighbors, or an employer." S. Rep. No. 95-382, at *1–2 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1696; see also id. at *4, 1977 U.S.C.C.A.N. at 1699 (noting that the FDCPA included the "extremely important protection" prohibiting "disclosing the consumer's personal affairs to third persons"); see also FTC, Statements of General Policy or Interpretation Staff Commentary On the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097 (Dec. 13, 1988) (providing that a debt collector may contact an employee of a telephone or telegraph company in order to contact the consumer, but only allowing the communication of that information "necessary to enable the collector to transmit the message to, or make contact with, the consumer").

On the facts of this case, Allied was correct not to disclose the nature of its calls to plaintiff's office staff, and clearly refrained from doing so not in an attempt to harass plaintiff by means of anonymous calls, but in a good faith effort to comply with the various goals of the FDCPA. While this Court recognizes that numerous, repeated calls to office staff or receptionists could rise to the level of harassment, the only admissible evidence here suggests that relatively few calls were answered by plaintiff's receptionists, providing insufficient support for any claim of violation of § 1692d.[13]

[13] To the extent that plaintiff also alleges that Allied's agents failed to make a meaningful disclosure of their identity when speaking with her, this assertion is contradicted by evidence in the record. Allied provided—and plaintiff did not challenge—call logs that indicate that she contacted Allied on January 17, 2005, only two days after the first phone call was made, and spoke with an Allied employee regarding her debt. See Guidry v. Clare, 442 F. Supp.2d 282, 289 (E.D. Va. 2006). Accordingly, plaintiff must have been aware of who was calling her in order to return those calls.

c) <u>Threats to report plaintiff to consumer reporting agency</u>

During at least one phone conversation and in the notice letter, Allied told plaintiff that she would be reported to a consumer reporting agency if she did not pay her debt. Plaintiff claims that this "threat" constitutes conduct intended to "annoy, abuse, or harass" under § 1692d. Allied's "threat" to report plaintiff's debt does not, under the circumstances, violate § 1692d. Credit reporting of this kind this kind is routine and expressly permitted under § 1692d(3), and is among the options a debt collector may choose to encourage repayment of a debt. 15 U.S.C. § 1692d(3) ("[C]onduct the natural consequence of which is to harass, oppress, or abuse any person" includes "the publication of a list of consumers who allegedly refuse to pay debts, *except to a consumer reporting agency . . . .*") (emphasis added).

"Threats to do what one may properly do are not ordinarily deemed improper or actionable." <u>Sluys v. Hand</u>, 831 F. Supp. 321, 327 (S.D.N.Y. 1993) (citation omitted). Merely informing a debtor that her debt, if not paid, will be reported to a consumer reporting agency does not, by itself, constitute a violation of the FDCPA. Indeed, "[i]t would be counterproductive to penalize a debt collector for suggesting that steps which legally could be taken might in fact be taken." <u>Spira v. Ashwood Fin., Inc.</u>, 371 F. Supp. 2d 232, 237 (E.D.N.Y. 2005).

*D. Notice of debt – 15 U.S.C. § 1692g*

Under 15 U.S.C. § 1692g, a debt collector must, "within five days after initial communication with a consumer in connection with the collection of a debt . . . send the

20

consumer a written notice" providing certain details about the alleged debt, including *inter alia*, its amount, and the creditor to whom it is owed. 15 U.S.C. § 1692g(a). Plaintiff alleges that Allied did not send her a notice of debt within five days of its initial communication with her, thus violating this provision. This claim fails, and is dismissed.

The dispute revolves around the date of the Allied's initial communication with plaintiff. It is uncontested that, at the latest, Allied sent a letter to plaintiff on January 18, 2005 containing the required notice. Plaintiff alleges that Allied's first contact with her was "around January 2, [2005]," making the notice tardy, while Allied alleges that its first call to plaintiff took place on January 15, 2005, making it timely. Allied produced a call log and deposition testimony indicating that the Allied did not even receive plaintiff's account until January 12, 2005 and that the first call to her was not made until January 15, 2005. Again, plaintiff relies on conclusory allegations and produces no evidence to show that Allied's first communication with her took place on January 2. Her affidavit on this question is again too general (Allied's contact with her receptionists took place "between December 2004 and January 2005") and indeed appears inconsistent with allegations in other parts of her papers.[14] Nor does plaintiff provide any supporting evidence, such as phone records, showing that calls ever took place prior to January 15, 2005. See Bickerstaff, 196 F.3d at 452; Wahad, 179 F.R.D. at 435; Goldston, 2006 WL 2595194, at *4. Because Allied has met its burden and plaintiff has not, summary judgment is also granted to Allied on this issue.

[14] See footnote 4, supra, for a list of the different dates cited by plaintiff.

## III.    The Fair Credit Reporting Act

The FCRA was enacted to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). The statute gives consumers a private right of action against consumer reporting agencies[15] for the willful, see id. § 1681n,[16] or negligent, see id. § 1681o,[17] violation of any duty imposed by the FCRA. See Casella v. Equifax Credit Info. Servs., 56 F.3d 469, 473 (2d Cir. 1995) (citation omitted). Plaintiff accuses Trans Union of willfully and/or negligently violating

---

[15] The parties do not dispute that Trans Union is a "consumer reporting agency" as so defined by FCRA.

[16] Section 1681n, entitled "Civil liability for willful noncompliance," states that:

> Any consumer reporting agency or user of information which willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of:
>
> (1) any actual damages sustained by the consumer as a result of the failure;
>
> (2) such amount of punitive damages as the court may allow; and
>
> (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

[17] Section 1681o, entitled "Civil liability for negligent noncompliance," states that:

> Any consumer reporting agency or user of information which is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of:
>
> (1) any actual damages sustained by the consumer as a result of the failure;
>
> (2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

its duty to reinvestigate disputed information on plaintiff's credit report, in violation of 15 U.S.C. § 1681i(a).[18]

Where credit information is disputed, § 1681i(a) requires consumer reporting agencies to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." 15 U.S.C. 1681i(a)(1)(A). The agencies have thirty days to conduct this reinvestigation after receiving "notice of the dispute from the consumer or reseller." Id. However, consumer reporting agencies do not have a duty to reinvestigate a consumer's credit information absent notice from the consumer that the information is inaccurate. Casella, 56 F.3d at 474; Caltabiano v. BSB Bank & Trust Co., 387 F. Supp. 2d 135, 140 (E.D.N.Y. 2005). Trans Union could not, therefore, have violated § 1681i(a) before plaintiff contacted the company through her December 23, 2004 Dispute Letter. Up until that date, Trans Union did not have notice of a potential inaccuracy in plaintiff's report and was entitled to rely on the initial information it had received from RMA. Caltabiano, 387 F. Supp. 2d at 140. Trans Union therefore cannot be held liable for credit denials that took place prior to that date, including the denials of November 30, 2004 (the Bank of America letter) and December 20, 2004 (the Discover letter).

After December 23, 2004, Trans Union was required to conduct a "reasonable reinvestigation," 15 U.S.C. § 1681i(a)(1)(A), of plaintiff's credit information, following the

---

[18] Although plaintiff fails to indicate which FCRA statutory provisions she alleges impose duties on Trans Union, citing only those provisions that establish civil liability for noncompliance, 15 U.S.C. §§ 1681n, 1681o, her summary judgment briefing makes clear that she is relying on § 1681i(a).

procedures laid out in § 1681i. While the Second Circuit has not defined what constitutes a "reasonable reinvestigation," other courts have addressed the issue, as has the FTC in a report to Congress. See, e.g., Henson v. CSC Credit Servs., 29 F.3d 280, 286–87 (7th Cir. 1994) ("When a credit reporting agency receives such notice [requesting reinvestigation], it can target its resources in a more efficient manner and conduct a more thorough investigation. Accordingly, a credit reporting agency may be required, in certain circumstances, to verify the accuracy of its initial source of information . . . . Whether the credit reporting agency has a duty to go beyond the original source will depend, in part, on whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source is unreliable. The credit reporting agency's duty will also depend on the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer."); accord Cushman v. Trans Union Corp., 115 F.3d 220, 225–26 (3d Cir. 1997); FTC & Board of Governors of the Federal Reserve System, Report to Congress on the Fair Credit Reporting Act Dispute Process (August 2006), at 13 & n.79, available at http://www.ftc.gov/os/comments/fcradispute/P044808fcradisputeprocessreport tocongress.pdf; cf. Stevenson v. TRW Inc., 987 F.2d 288, 293 (5th Cir. 1993) ("In a reinvestigation of the accuracy of credit reports [pursuant to § 1681i(a)], a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers."). Where the consumer has given the consumer reporting agency no reason to question the accuracy of the initial information provided by the subscriber, the consumer reporting agency fulfills its

obligation to reasonably reinvestigate by confirming the accuracy of the debt with the creditor. See, e.g., Podell v. Citicorp, 914 F. Supp. 1025, 1032 (S.D.N.Y. 1996).

Before reaching the issue of whether Trans Union failed to reasonably reinvestigate plaintiff's disputed debt here, however, this Court will first turn to the question of whether plaintiff has established that her credit report, including the disputed Nextel debt, was, in fact, inaccurate. A plaintiff asserting claims under § 1681i must demonstrate that the disputed information is inaccurate in order to prevail on allegations that a consumer reporting agency had failed to reasonably reinvestigate a disputed item. See, e.g., Deandrade v. Trans Union LLC, 523 F.3d 61, 67 (1st Cir. 2008) (collecting cases, and noting that the majority of federal appellate courts had adopted this rule); Ruffin-Thompkins v. Experian Info. Solutions, Inc., 422 F.3d 603, 608 (7th Cir. 2005); Gorman v. Experian Info. Solutions, Inc., No. 07-CV-1846, 2008 U.S. Dist. LEXIS 94083, at *12–13 (S.D.N.Y. Nov. 18, 2008). This rule is based on both the purpose of the FCRA, "to protect consumers against the compilation and dissemination of *inaccurate* credit information," Deandrade, 523 F.3d at 67, and the fact that "it is difficult to see how a plaintiff could prevail on a claim for damages under § 1681i without a showing[] that the disputed information disclosed by the credit agency was, in fact, inaccurate," id. Furthermore, in Deandrade, the First Circuit held that a collateral attack based on a legal, not factual, challenge to the validity of a particular debt that was accurately reported to the credit bureau could not establish a violation of § 1681i's "reasonable reinvestigation" requirement. Id. at 67–68; see also Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1160 (11th Cir. 1991) ("No reasonable

25

reinvestigation on the part [of the credit agency] could have uncovered an inaccuracy in [plaintiff's] report because there was never any factual deficiency in the report.") (quoted in Deandrade, 523 F.3d at 68). Here, plaintiff has failed to demonstrate that Trans Union's reporting of her debt to Nextel was inaccurate, as Trans Union confirmed the accuracy of the information regarding the debt that it had received from RMA, and plaintiff's dispute of the debt turned on a collateral attack on the validity of the debt that could only be resolved with Nextel (and, as it turned out, was only resolved as part of a settlement with Nextel of the instant action). No reasonable reinvestigation by Trans Union, even had it contacted Nextel to determine the status of the debt, would have resulted in the debt being removed from plaintiff's credit report. Furthermore, plaintiff's letter disputing the debt did not raise any challenge to accuracy or reliability of the original source (RMA) of the reported information, but instead categorically disputed the validity of the debt. (See Dec. 20, 2004 Dispute Letter.) For these reasons, this Court holds that Trans Union fulfilled its obligations under § 1681i, and plaintiff's claim should be dismissed.

Moreover, even if Trans Union had failed to meet its reinvestigation obligations, plaintiff has not demonstrated that there is a disputed issue of fact as to whether she was harmed as a result of credit reports published by Trans Union. As an essential element of her claim, plaintiff must show that a potential creditor became aware of the derogatory credit report. Plaintiff provides documentary evidence only for the credit denials by Bank of America and Discover, both of which took place before plaintiff's December 23, 2004 Dispute Letter. As a result, Trans

26

Union cannot be held liable for these credit denials. See Caltabiano, 387 F. Supp. 2d at 140 (dismissing claims arising out of credit denial prior to plaintiff's provision of notice of inaccuracy to credit bureau).

Plaintiff further argues that she was injured because the negative credit report against her was "in the public domain." (Pl.'s Mem. L. Opp'n Def. Trans Union's Mot. Summ. J. (Docket No. 45) at 13.) Plaintiff asserts, and the Second Circuit has held, that a credit denial is not essential to an FCRA claim, because damages can include humiliation and mental distress, even in the absence of out-of-pocket expenses. Casella, 56 F.3d at 474; cf. Spector v. Trans Union LLC, 301 F. Supp. 2d 231, 236–37 (D. Conn. 2004) (holding defendant not entitled to summary judgment when creditors *had* become aware of damaging information on plaintiff's credit report, even though no credit denial had been issued). However, the court in Casella also noted that a plaintiff cannot recover for pain and suffering when he has failed to show that any creditor or other person ever learned of the derogatory credit information. 56 F.3d at 475. Despite plaintiff's conclusory allegations, plaintiff presented no admissible evidence, either direct or circumstantial, that Trans Union disclosed the derogatory credit information to any party after plaintiff disputed her debt. Plaintiff effectively claims that she is entitled to damages for pain and suffering simply because *she* knew of an inaccurate and potentially damaging item in her credit report. (Pl.s' Mem. at 12.) Yet plaintiff apparently concedes, and this Court holds, that she must at least demonstrate that some creditors became aware of the allegedly inaccurate information in order to recover. (Id. at 12–13.) See Spector, 301 F. Supp. 2d at 237 (discussing

27

Casella); McMillan v. Experian, 1710 F. Supp. 2d 278, 286 n.10 (D. Conn. 2004) (cited in Spector, 301 F. Supp. 2d at 237). Plaintiff has not alleged any such post-dispute disclosure, and therefore has failed to meet her burden under the FCRA. As a result, summary judgment must be granted to Trans Union on this claim as well.

## IV.    State Law Claims

Plaintiff apparently also seeks to advance various state law claims against Allied and Trans Union. When federal claims are dismissed before trial, the district court ordinarily should decline the exercise of jurisdiction by dismissing the state claims without prejudice. Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). Plaintiff's state law claims are therefore dismissed without prejudice.

## CONCLUSION

For the reasons set forth above, the Court finds that defendants Allied and Trans Union are entitled to summary judgment on all of plaintiff's federal claims. Plaintiffs' state law claims are dismissed without prejudice. This matter is hereby DISMISSED.

SO ORDERED.


Dated: Brooklyn, New York
       March 25, 2009                    _____
                                         ROSLYNN R. MAUSKOPF
                                         United States District Judge


28